NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

FILED
November 13, 2019
Carla Bender
4th District Appellate
Court, IL

2019 IL App (4th) 190377-U

NOS. 4-19-0377, 4-19-0378, 4-19-0379 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* I.L., a Minor | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
|        Petitioner-Appellee, | ) | No. 17JA90 |
|        v. | ) | |
| Brittany L., | ) | |
|        Respondent-Appellant). | ) | |
| ———————————————————— | ) | |
| *In re* A.Q., a Minor | ) | |
| | ) | No. 17JA91 |
| (The People of the State of Illinois, | ) | |
|        Petitioner-Appellee, | ) | |
|        v. | ) | |
| Brittany L., | ) | |
|        Respondent-Appellant). | ) | |
| ———————————————————— | ) | |
| *In re* K.L., a Minor | ) | |
| | ) | No. 17JA92 |
| (The People of the State of Illinois, | ) | |
|        Petitioner-Appellee, | ) | |
|        v. | ) | Honorable |
| Brittany L., | ) | Karen S. Tharp, |
|        Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices DeArmond and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's findings respondent was unfit under section 1(D)(m)(ii) of
the Adoption Act and it was in the minor children's best interests to terminate
respondent's parental rights were not against the manifest weight of the evidence.

¶ 2          In September 2018, the State filed motions for the termination of the parental

rights of respondent, Brittany L., as to her minor children, I.L. (born in January 2017), A.Q. (born in November 2013), and K.L. (born in October 2011). The State later filed amended termination motions. After a four-day hearing, the Sangamon County circuit court found respondent unfit as alleged in the amended termination motions. At a June 2019 hearing, the court found it was in the minor children's best interests to terminate respondent's parental rights.

¶ 3 Respondent appeals, asserting the circuit court erred by (1) finding her unfit and (2) concluding it was in the minor children's best interests to terminate her parental rights. We affirm.

¶ 4                                  I. BACKGROUND

¶ 5        I.L. and A.Q.'s father is Kenneth Q., and K.L.'s father is Joshua L. Kenneth Q. filed his own appeal, which this court docketed as case Nos. 4-19-0389 and 4-19-0390. Joshua L. never entered an appearance in this case. In June 2017, the State filed petitions for the adjudication of wardship of the minor children, which alleged the minor children were neglected pursuant to section 2-3(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (West 2016)). Specifically, the petition contended the minor children were not receiving the proper care and supervision necessary for their well-being, in that respondent failed to a make a proper care plan for the minor children. At a November 2017 hearing, respondent stipulated the minors were neglected as alleged in the petitions and the circuit court adjudicated the minor children neglected. After a December 2017 hearing, the court found respondent was unfit, unable, or unwilling to care for the minor children, made the minor children wards of the court, and placed their custody and guardianship with the Department of Children and Family Services (DCFS).

¶ 6        In September 2018, the State filed motions to terminate respondent's parental

rights to the minor children. The motions asserted respondent was unfit because she failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the minor children's welfare (750 ILCS 50/1(D)(b) (West 2018)) and (2) make reasonable efforts to correct the conditions which were the basis for the removal of the minor children from her within nine months after the neglect adjudication, specifically November 8, 2017, to August 8, 2018 (750 ILCS 50/1(D)(m)(i) (West 2018)). The next month, the State filed amended motions for the termination of parental rights alleging respondent was unfit because she failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the minor children's welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) make reasonable efforts to correct the conditions which were the basis for the removal of the minor children from her within nine months after the neglect adjudication, specifically November 8, 2017, to August 8, 2018 (750 ILCS 50/1(D)(m)(i) (West 2018)); and (3) make reasonable progress toward the minor children's return to her within nine months after the neglect adjudication, specifically November 8, 2017, to August 8, 2018 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 7 On December 12, 2018, the circuit court commenced the fitness hearing. The State presented the testimony of (1) Dr. Joel Eckert, a clinical psychologist; (2) Laura Bell, a case supervisor employed by Camelot Care Center (Camelot); and (3) Chazla Johnson, a caseworker at Camelot. Respondent testified on her own behalf and presented the testimony of (1) Laura Salesski, a family advocate at Primed for Life; (2) Brenda Wilder, a licensed counselor at Tazwood; (3) Mekya Lackey, a friend of respondent; and (4) Jesse Pilkington, respondent's boyfriend. Kenneth Q. testified on his own behalf. The evidence relevant to the issues on appeal is set forth below.

¶ 8 Dr. Eckert testified he had been in private practice as a clinical psychologist since

1990, and the parties stipulated he was an expert witness in the field of clinical psychology. Dr. Eckert completed a psychological evaluation on respondent in January 2018. The evaluation was comprised of a clinical interview and psychological testing, intelligence testing, and academic achievement testing. Dr. Eckert had also received some background information and documents from DCFS, which he did not review until after his interview of respondent. After conducting the evaluation, he drafted a 16-page report that was admitted as State's Exhibit A.

¶ 9 During the clinical interview, Dr. Eckert learned respondent had prior psychiatric intervention, including inpatient treatment. Dr. Eckert described respondent's history as very complex. From the interview, Dr. Eckert gained the impression respondent's life had been chaotic and disorganized since birth. Respondent appeared to lack stability as evidenced by her many moves and different relationships. The tests indicated respondent's intellectual ability was within the low average range but not low enough to be a concern. Moreover, Dr. Eckert diagnosed respondent with an adjustment disorder. He gave her this conservative diagnosis because of the lack of information he could glean from the psychological testing. Specifically, Dr. Eckert noted respondent was guarded throughout the evaluation, which impeded his ability to make a detailed diagnosis. Dr. Eckert admitted being guarded was not unexpected for a person referred by DCFS. Additionally, Dr. Eckert testified respondent could be easily influenced by others and opined respondent's "core personality is poorly glued together."

¶ 10 Based on her history of instability and lack of nurturing as a child, Dr. Eckert was "very concerned" about respondent's ability to parent. He testified respondent needed 12 months of "intensive counseling" followed by group treatment. In the treatment, respondent would need to be less guarded and defensive for the treatment to have an effect. In his experience, "past behavior is always the best predictor of future behavior." Dr. Eckert further noted the "longer

the track record, the more valuable that is." Dr. Eckert testified he believed respondent could improve her ability to parent but respondent would have to dedicate herself to the process.

¶ 11    Bell testified she was assigned as the supervisor for the minor children's case in September 2017. She explained the first service plan covered June 2017 to December 2017. That plan required respondent to find a legal means of support, obtain housing, cooperate with parenting classes, engage in mental-health treatment, and cooperate with DCFS and Camelot. DCFS had already made the necessary referrals for respondent's services before Bell received the case. When the service plan was reviewed in December 2017, respondent received a satisfactory rating for cooperation with the agencies. As to housing, respondent received an unsatisfactory rating because she moved away from her children in Springfield in October 2017. Bell had offered to help her with housing in Springfield, but respondent chose to live with a friend in Pekin, Illinois. Respondent also received an unsatisfactory rating for maintaining a legal means of support because she was not employed during the period. Respondent also did not cooperate with the mental-health treatment. Additionally, while respondent completed a parenting class, she did not show she had gained any knowledge from it during visits with the minor children. Bell referred respondent to Primed for Life to get additional assistance with parenting. Respondent's overall rating on the first service plan was unsatisfactory.

¶ 12    Bell next testified about the second service plan which covered January 2018 to June 2018. Respondent's tasks stayed the same. Bell noted Camelot had made new referrals when respondent moved to Pekin. When the service plan was reviewed in June 2018, respondent again received an overall unsatisfactory rating. Respondent did receive a satisfactory rating for cooperation with DCFS and Camelot. She again was rated unsatisfactory on housing. She had lived with Lackey, who had exotic animals in the home. Respondent also received an

unsatisfactory rating for mental-health treatment. Moreover, respondent still had the task of parenting classes because she was still having difficulty at visits. Respondent was employed during the period with part-time jobs at Dollar General and Kroger.

¶ 13 Bell also testified about the third service plan, which started in June 2018 and ended in December 2018. With the third service plan, respondent received an unsatisfactory rating for mental-health treatment because she was only attending counseling once a month. Respondent was living with Pilkington, her boyfriend. Pilkington was not asked to engage in services because respondent was never to the point where the minor children were close to returning home.

¶ 14 As to visitation, respondent started with weekly hour-long visits that were supervised at the Camelot office or a community location. The visits were supervised by case aides, and Bell had been present for about five of the visits. Respondent never had unsupervised visits and never had home visits. At some point, the visits were increased to two hours a week. In April 2018, Bell reduced K.L.'s visits with respondent to twice a month because K.L. was having behavioral problems after visits. Respondent only missed two or three visits, and the absences were due to transportation issues. Respondent was good about bringing gifts for the minor children's birthdays and on holidays, and she also brought games and snacks to visits. A few times, respondent brought inappropriate meals or snacks. In Bell's opinion, respondent was unable to demonstrate she had learned anything from parenting classes. According to Bell, respondent was unable to parent all three children at the same time. For example, one of the children would be wandering in the hallway, and respondent would not even notice the child was gone. Respondent also was unable to appropriately console a crying child.

¶ 15 Bell also testified DCFS and Camelot were never close to returning the minors to

respondent because respondent did not make significant progress. The progress respondent did make was cooperating with DCFS and Camelot and maintaining employment. Respondent did attend a counseling program in the Peoria area, but she was discharged due to absences. The Crittenton Center, which provided the parenting coach program, also dropped respondent from the services about three months before the hearing for failure to attend meetings. Additionally, Bell testified she made copies of the minors' social security cards and returned the original cards to respondent.

¶ 16 Johnson testified she was employed by Camelot as a caseworker from May 2017 to August 2018. She became the caseworker for the minor children in April 2018. When Johnson took over the case, all the referrals were in place for respondent. Johnson also testified respondent received an overall unsatisfactory rating in June 2018 for the second service plan. According to Johnson, respondent received satisfactory ratings for cooperation, parenting, and legal means of income. However, respondent received unsatisfactory ratings for housing and mental-health treatment because she was not attending counseling regularly and lived in a home with exotic animals. During Johnson's time as a caseworker, respondent had three different jobs. Respondent worked at Dollar General and Kroger, and in June 2018, she started working for a telemarketing company in Peoria.

¶ 17 As to visitation, Johnson testified respondent had weekly visits that were two hours long. Johnson observed the visits at least twice a month. While she was the caseworker, respondent was never given unsupervised visits due to the chaotic nature of respondent's supervised visits. Johnson explained multiple incidents occurred where the children would run out of the room and respondent would not even know they were gone. Johnson personally observed a time when I.L. was chewing on a crayon and then walked over to an electrical outlet

and tried to stick her wet hand in the outlet. At the same time, A.Q. was running wild in the room. Based on the visits, a parenting capacity assessment was recommended, but it did not take place before Johnson left the agency. Johnson did a safety check on respondent's home in August 2018 and found it unsafe because it was a "construction zone" with plaster in the tub and no running water. Johnson also noted the home had limited furniture. Additionally, Johnson testified she was never close to returning the minor children to respondent's care because respondent had not completed all her services on the service plan.

¶ 18 Salesski testified she was a family advocate for respondent from early 2017 to June 2018. Her role was to help respondent navigate the DCFS process and services. Specifically, Salesski observed respondent's visits with her children, provided respondent transportation, and helped respondent understand the process. In respondent's case, Camelot provided her with transportation. Salesski also assisted respondent in getting her children's birth certificates and social security numbers, which respondent needed to obtain housing. Salesski explained in November 2017 respondent was "couch surfing" after being kicked out of her aunt's home. Respondent applied for housing with the housing authority and was told she needed her minor children's social security cards to put the children's names on the lease. According to Salesski, the caseworker and supervisor would not give respondent the copies they had of the minor children's social security cards because they believed respondent would be defrauding the state. Respondent finally got the information in March 2018. From December 2017 to March 2018, respondent was living with a friend named Travis in Pekin, Illinois. After living with Travis, respondent had a residence in the Peoria area with several roommates and was paying her part of the rent. In June 2018, respondent moved into a home respondent believed would be appropriate for the minor children, but Salesski never visited the residence.

¶ 19        Additionally, Salesski testified she observed 12 to 15 of respondent's visits with the children because respondent claimed the case aides were reporting things that were not happening. Salesski testified the visits were typical for three small children in a cramped room. She admitted the visits would "get a little crazy." The visits were not moved out of Camelot's visitation room because Camelot had concerns respondent could not control the minor children. Respondent was good about getting one child engaged in something, then turning her attention to another child, and going back and forth. According to Salesski, the minor children were always vying for respondent's attention. Moreover, respondent also provided the minor children with a healthy snack and juice. Salesski testified the case aides did complain the juices were too sugary.

¶ 20        As to respondent's other goals, Salesski testified respondent always had a job from April 2017 forward and did not require Salesski's assistance to get employment. Respondent's caseworkers had an issue with respondent's employment because respondent changed jobs frequently and then the caseworker would need to rearrange respondent's visits. Moreover, Salesski was unaware of any services Camelot provided to respondent or referrals the agency made for respondent. Salesski admitted DCFS had made referrals for respondent before Camelot received the case. According to Salesski, respondent found her own counselor and was paying for it with a medical card. Salesski also testified she never heard of any complaints about respondent from her counselor. When Salesski last met with respondent, respondent was in counseling, her visits were going well, respondent was working, and respondent was remodeling a residence that was appropriate for her and the minor children. Respondent also had a car and was working on getting her driver's license. In Salesski's opinion, respondent was doing what she needed to be doing.

¶ 21　　　　　Wilder testified she had been a licensed professional counselor since May 2018 and had been treating respondent at Tazwood since August 2018. She met with respondent twice a month for an hour session in accordance with Tazwood's policy. Weekly sessions were only for those experiencing a mental-health crisis. Before Wilder was her counselor, respondent received counseling from a Tazwood social worker from January 2018 to June 2018. During that period, respondent had attended only four sessions due to conflicts with respondent's work schedule. Respondent switched counselors because Wilder's hours were more accommodating to respondent's work schedule. Wilder testified anxiety was a concern for respondent and they created goals for addressing, managing, and reducing it. Wilder did not find respondent had any other mental-health problems. Wilder explained anxiety was graded on a 10-point scale with 10 being the highest level. Respondent had been able to reduce her anxiety level from the seven to eight range to the four to five range. As a policy, Wilder did not address past issues unless the client raised the issues. Respondent's sessions with Wilder were paid for by respondent's Medicaid insurance. Respondent lost her insurance and had paid for some of the sessions herself. Respondent had not attended a session since January 25, 2019.

¶ 22　　　　　Lackey testified she had known respondent since December 2016. Respondent had asked for help in obtaining public housing for her and the children. In February 2018, respondent told her she could not get public housing because she was unable to get her children's birth certificates and social security cards. Lackey then started looking for affordable housing for herself and respondent to share the expenses. In March 2018, Lackey signed a lease for a six-bedroom house in Peoria. The first month Lackey spent around $3000 making sure the home was safe for respondent's children. Lackey and respondent moved into the home around April 13, 2018. Lackey owned two foxes, one tarantula, three snakes, two turtles, one iguana, and five

sugar gliders. The animals were all in Lackey's bedroom, which was locked when she was not present. The animals did not run loose in the home. DCFS would not allow respondent to live in the home due to the exotic animals. According to Lackey, no one from DCFS ever came to inspect the home. Around May 20, 2018, respondent moved out of the home and went to live with her boyfriend in Canton. In July 2018, respondent showed Lackey her new apartment, which was the downstairs of a home. Respondent had remodeled the apartment to make it three bedrooms.

¶ 23        Pilkington testified he was a customer service representative at Hindaiju Global Solutions (HGS) where respondent also worked. He had been dating respondent since April 2018. On May 28, 2018, Pilkington and respondent signed a month-to-month lease for a lower-story apartment with $500 monthly rent. The apartment consisted of three bedrooms, a main room, kitchen, bathroom, and front and back porches. They moved in and began remodeling the apartment. In July 2018, Pilkington talked to Johnson and provided his information for a background check. He also told Johnson he was willing to do services. Pilkington did not have children of his own. Additionally, Pilkington testified he had 2016 misdemeanor convictions for (1) possession of under 2.5 grams of cannabis for which he paid a $500 fine and (2) battery for which he served 30 days in jail. Pilkington also had some traffic infractions and did not have a valid driver's license. For the past three to four months, respondent had done all the driving because she had obtained her driver's license.

¶ 24        After Johnson had twice canceled the home inspection, she inspected Pilkington and respondent's apartment on August 13, 2018. Pilkington explained they were in the middle of painting when Johnson came and some electrical outlet covers were removed for painting purposes. The water line was shut off because Pilkington had cut a water line when he tiled the

bathroom. They remedied the problems within two or three days of the inspection.

¶ 25 Respondent testified she was currently 27 years old. She married Kenneth Q. in March 2013. They moved several times, and K.L. was in temporary custody for a period. In October 2016, she left Kenneth Q. in California and moved to Springfield, Illinois, with her two children (she was pregnant with the third) to live with her mother's sister. At the time of the fitness hearing, neither she nor Kenneth had initiated divorce proceedings.

¶ 26 In Springfield, respondent initially moved in with her aunt but then ended up living in several different residences. DCFS became involved in May 2017. Respondent testified DCFS had made a referral for services in Springfield. In August 2017, respondent decided to move to Pekin, and DCFS told her she would not receive any assistance if she moved to Pekin because it was out of its jurisdiction. Respondent felt she could get on her feet faster in Pekin, so she moved there and lived with a friend named Travis. Respondent admitted her living situation in Pekin was not appropriate for the minor children. While she lived in Pekin, DCFS did provide her transportation to her visits in Springfield.

¶ 27 In January 2018, respondent began trying to get housing through the Pekin Housing Authority and learned she needed to present the minor children's social security cards. According to respondent, her first caseworker had taken the social security cards and had never given them back. Since she could not get the social security cards, respondent started looking for other housing. Respondent did eventually get the cards back in June or July 2018 when Johnson became her caseworker.

¶ 28 In April 2018, respondent moved into the Peoria home with Lackey. Respondent testified her name was not originally on the lease, but she added her name within a few days of moving in. Respondent testified her caseworker refused to inspect the home, so she moved out

in May 2018 to her current home in Canton. The Canton home required remodeling. According to respondent, Johnson cancelled the inspection three times. On the day Johnson did inspect the home, respondent and Pilkington were painting the residence and the water was turned off due to the pipe problem. According to respondent, the point of Johnson's visit was to notify respondent DCFS was seeking the termination of her parental rights, and Johnson did not meaningfully inspect the home. Respondent also testified she never received any assistance from DCFS in getting housing.

¶ 29    As to employment, respondent started working part-time at the Pekin Family Dollar in November 2017. Respondent obtained full-time employment at Kroger in February 2018. She worked both jobs for a short time. In May 2018, respondent started working full-time at HGS and still worked there. At the time of the hearing, respondent worked 40 hours a week at HGS. Respondent never received any kind of aid or money from DCFS for financial support.

¶ 30    Additionally, respondent testified Dr. Eckert's report contained numerous errors. Respondent denied ever receiving inpatient mental-health treatment. She admitted she had anxiety and had failed to obtain consistent treatment for it. Respondent obtained her own counselor. In her opinion, she had been engaged in "tough" counseling for about eight months at the time of the hearing. Respondent felt the counseling was helping her a great deal. Respondent testified in August 2018 she was doing everything she needed to complete her service plan. She had a job and a home and was attending counseling and visits.

¶ 31    Kenneth testified he did not recall respondent being hospitalized when they lived in the state of Washington. Kenneth did testify respondent had panic attacks about twice a month in Washington and sought counseling at a local counseling facility. According to Kenneth, respondent had panic attacks less often in California and did not seek treatment for

them.

¶ 32    After hearing the parties' arguments, the circuit court found all three of the parents involved in this case unfit on all grounds alleged in the petition. On April 25, 2019, the court entered the written adjudication order finding respondent unfit.

¶ 33    On June 13, 2019, the circuit court held the best-interests hearing. The State presented the testimony of Adrianna Stevenson, a caseworker at Camelot, and respondent testified on her own behalf.

¶ 34    Stevenson testified she had been the caseworker for the minor children's case since October 2018. K.L. was now seven years old and had been in her placement since June 2017. The placement is a specialized one because K.L. has posttraumatic stress syndrome and "behaviors." Since being in the home, K.L.'s behaviors had significantly decreased, she was doing better in school, and K.L. was involved in the community. K.L. attended church with her foster family. K.L. got along with her 16-year-old foster sister and referred to her foster parents as mom and dad. K.L. was bonded with her foster parents and sought comfort from them. Her foster parents were willing to adopt her and keep a relationship open with respondent.

¶ 35    Stevenson further testified I.L. was now two years old and A.Q. was five years old. They too had been in their placement since June 2017. K.L.'s foster mother was a cousin of one of A.Q. and I.L.'s foster fathers, which allowed for sibling visits. A.Q. and I.L. were also making progress in their placement. A.Q.'s speech had improved, and both children were thriving. I.L. was in gymnastics, and A.Q. was in swimming. They too attended church with their foster fathers and referred to their foster fathers as "dad." Stevenson said a bond existed between A.Q. and I.L. and their foster fathers.

¶ 36    Stevenson had observed five to six visits between respondent and the minor

children.  The minor children referred to her as mom and know she is their mother.  The minor children had never indicated they do not want to go home to respondent.  According to Stevenson, respondent had trouble tending to the needs of all three minor children.  Respondent also discussed with the minor children she was getting their rooms ready for them to come home.  After visits, A.Q. would not listen to his foster father.  K.L. got really anxious before visits with respondent.  K.L. was not placed with her siblings because she had some aggressive and negative behaviors toward them.  At sibling visits, the minor children got along well.  In Stevenson's opinion, respondent's parental rights should be terminated.

¶ 37      Respondent testified she had been living in the same home and had the same job for over a year.  She also had the same boyfriend and their relationship was going well.  Respondent had not missed any visits with the children and wanted to have future contact with them.  Respondent planned on staying in Illinois permanently.  She was still in counseling and planned on starting classes for her general equivalency diploma in July 2019.  Respondent also had a driver's license and owned a car.

¶ 38      At the conclusion of the hearing, the circuit court found it was in the minor children's best interests to terminate respondent's parental rights.  On June 13, 2019, the court entered a written order terminating respondent's parental rights to the minor children.

¶ 39      On June 17, 2019, respondent filed a notice of appeal in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017).  See Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001) (providing the rules governing civil cases also govern appeals from final judgments in all proceedings under the Juvenile Court Act, except for delinquency cases).  Thus, this court has jurisdiction of this appeal pursuant to Illinois Supreme Court Rule 307(a)(6) (eff. Nov. 1, 2017).

¶ 40                                    II. ANALYSIS

¶ 41    Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2018)), the involuntary termination of parental rights involves a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006). If the circuit court makes a finding of unfitness, then the State must prove by a preponderance of the evidence it is in the minor children's best interests that parental rights be terminated. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228 (2004).

¶ 42    Since the circuit court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, it is in the best position to determine the credibility and weight of the witnesses' testimony. *In re E.S.*, 324 Ill. App. 3d 661, 667, 756 N.E.2d 422, 427 (2001). Further, in matters involving minors, the circuit court receives broad discretion and great deference. *E.S.*, 324 Ill. App. 3d at 667, 756 N.E.2d at 427. Thus, a reviewing court will not disturb a circuit court's unfitness finding and best-interests determination unless they are contrary to the manifest weight of the evidence. See *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 516-17 (2005) (fitness finding); *In re J.L.*, 236 Ill. 2d 329, 344, 924 N.E.2d 961, 970 (2010) (best-interests determination). A circuit court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Gwynne P.*, 215 Ill. 2d at 354, 830 N.E.2d at 517.

¶ 43                                    A. Respondent's Fitness

¶ 44    Respondent contends the circuit court erred by finding her unfit. The State asserts it proved respondent was an unfit parent for failure to make reasonable progress.

¶ 45    In this case, the circuit court found respondent unfit on three separate grounds,

one of which was under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)). That section provides a parent may be declared unfit if he or she fails "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act." 750 ILCS 50/1(D)(m)(ii) (West 2018). Illinois courts have defined "reasonable progress" as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046, 871 N.E.2d 835, 844 (2007) (quoting *In re C.N.*, 196 Ill. 2d 181, 211, 752 N.E.2d 1030, 1047 (2001)). Moreover, they have explained reasonable progress as follows:

> " '[T]he benchmark for measuring a parent's "progress toward the return of the child" under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later became known and which would prevent the court from returning custody of the child to the parent.' " *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844 (quoting *C.N.*, 196 Ill. 2d at 216-17, 752 N.E.2d at 1050).

Additionally, this court has explained reasonable progress exists when a circuit court "can conclude that *** the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill.

- 17 -

App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991). We have also emphasized " 'reasonable progress' is an 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227 (quoting *L.L.S.*, 218 Ill. App. 3d at 461, 577 N.E.2d at 1387).

¶ 46        In determining a parent's fitness based on reasonable progress, a court may only consider evidence from the relevant time period. *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844 (citing *In re D.F.*, 208 Ill. 2d 223, 237-38, 802 N.E.2d 800, 809 (2003)). Courts are limited to that period "because reliance upon evidence of any subsequent time period could improperly allow a parent to circumvent her own unfitness because of a bureaucratic delay in bringing her case to trial." *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844. In this case, the petition alleged the relevant nine-month period was November 8, 2017, to August 8, 2018.

¶ 47        While respondent made some progress during the relevant nine-month period, she was never close to having the minor children returned to her. Although respondent completed a parenting class, she struggled to implement the parenting skills during visits with the minor children. Bell and Johnson both testified respondent had difficulty parenting the three children at the same time. The caseworkers never allowed visits outside the agency's visitation room due to concerns about respondent's ability to control the minor children. Also, in April 2018, respondent's visits with K.L. were reduced due to K.L. having behavior problems after visits.

¶ 48        Additionally, Dr. Eckert completed a psychological evaluation of respondent and was concerned about respondent's ability to parent because of her chaotic history and lack of nurturing. He recommended respondent engage in 12 months of intense counseling followed by group therapy. Dr. Eckert further explained respondent would need to be fully dedicated to that therapy process. During the relevant nine-month period, respondent attended only four therapy sessions. At the end of the period, respondent had started with a new counselor. However, that

counselor only addressed respondent's anxiety and not any of her past issues. Thus, respondent had not engaged in the necessary therapy during the nine-month period. Additionally, respondent had lacked a suitable home for the minor children during the nine-month period.

¶ 49    Accordingly, we conclude the circuit court's finding respondent unfit based on section 1(D)(m)(ii) of the Adoption Act was not against the manifest weight of the evidence.

¶ 50    Since we have upheld the circuit court's determination respondent met the statutory definition of an "unfit person" on the basis of failure to make reasonable progress (750 ILCS 50/1(D)(m)(ii) (West 2018)), we do not address the other bases for respondent's unfitness finding. See *In re Tiffany M.*, 353 Ill. App. 3d 883, 891, 819 N.E.2d 813, 820 (2004).

¶ 51                        B. Minor Children's Best Interests

¶ 52    Respondent also challenges the circuit court's finding it was in the minor children's best interests to terminate her parental rights. The State disagrees and contends the court's finding was proper.

¶ 53    During the best-interests hearing, the circuit court focuses on "the child[ren]'s welfare and whether termination would improve the child[ren]'s future financial, social and emotional atmosphere." *In re D.M.*, 336 Ill. App. 3d 766, 772, 784 N.E.2d 304, 309 (2002). In doing so, the court considers the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West Supp. 2017)) in the context of the children's age and developmental needs. See *In re T.A.*, 359 Ill. App. 3d 953, 959-60, 835 N.E.2d 908, 912-13 (2005). Those factors include the following: the children's physical safety and welfare; the development of the children's identity; the children's family, cultural, and religious background and ties; the children's sense of attachments, including continuity of affection for the children, the children's feelings of love, being valued, security, and familiarity, and taking into account the

least disruptive placement for the children; the children's own wishes and long-term goals; the children's community ties, including church, school, and friends; the children's need for permanence, which includes the children's need for stability and continuity of relationships with parent figures, siblings, and other relatives; the uniqueness of every family and each child; the risks attendant to entering and being in substitute care; and the wishes of the persons available to care for the children. 705 ILCS 405/1-3(4.05) (West Supp. 2017).

¶ 54 We note a parent's unfitness to have custody of his or her children does not automatically result in the termination of the parent's legal relationship with the children. *In re M.F.*, 326 Ill. App. 3d 1110, 1115, 762 N.E.2d 701, 706 (2002). As stated, the State must prove by a preponderance of the evidence the termination of parental rights is in the minor children's best interests. See *D.T.*, 212 Ill. 2d at 366, 818 N.E.2d at 1228. "Proof by a preponderance of the evidence means that the fact at issue *** is rendered more likely than not." *People v. Houar*, 365 Ill. App. 3d 682, 686, 850 N.E.2d 327, 331 (2006).

¶ 55 A review of the best-interests factors favors the termination of respondent's parental rights. All three minor children had lived in their respective foster homes for more than two years and were doing well in their foster homes. They were all safe in their foster homes, and their individual needs were provided for. K.L. was bonded with her foster sister. Moreover, all three minor children were involved in community activities and attended church with their foster families. The foster parents were all willing to provide the children with permanence and to maintain sibling bonds. While respondent had made many improvements in her life since the minor children came into care and indicated she was willing to do whatever it took to bring them home, she was still struggling with parenting all three children at the same time during supervised visits. The children were also bonded with respondent, but it was not clear if and

when respondent would be able to provide the stability and permanency the children needed.

¶ 56  Accordingly, we find the circuit court's conclusion it was in the minor children's best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 57        III. CONCLUSION

¶ 58  For the reasons stated, we affirm the Sangamon County circuit court's judgment.

¶ 59  Affirmed.